In re Denzil **ROBBINS, Debtor.**

Douglas S. **EVANS, Trustee, Plaintiff,**

v.

Denzil **ROBBINS, et al., Defendants.**

**Bankruptcy No. 81–03534–S–2.**
**Adv. No. 86–0377–S–2.**

United States Bankruptcy Court,
W.D. Missouri, S.D.

Sept. 13, 1988.

James R. Doran, Paul White, Springfield, Mo., for debtor.

Mathew W. Placzek, Springfield, Mo., for trustee.

Duane E. Schreimann, Jefferson City, Mo., Clifford C. Ruder, FDIC Legal Div., Oklahoma City, Okl., for FDIC.

## AMENDED MEMORANDUM OPINION

FRANK W. KOGER, Bankruptcy Judge.

### FACTS

This is an adversary proceeding in which the Trustee in bankruptcy seeks to set aside a mortgage held by the FDIC as receiver of the failed First National Bank of Del City (Bank), on property allegedly belonging to the estate of Denzil Robbins, debtor in a Chapter 7 proceeding.

The events leading up to this dispute began before this bankruptcy case was ever filed. On July 29, 1980, the real estate in question, called the Finley River Ranch (Ranch), was transferred from Frank and Georgia Whitman to Gard Corporation. On the same day, Gard Corporation deeded the Ranch to Denzil Robbins who then (also on the same day), along with his wife at that time, Audrey Robbins, deeded the property to Deegene Land Company. On July 15, 1981, Deegene Land Company deeded the Ranch to Gene Robbins (Denzil's son). The trustee asserts the purpose of the transfer to Deegene Land

Company and later to Gene Robbins was an attempt by Denzil Robbins to shield the property from his wife upon their divorce which took place on August 14, 1981. On November 16, 1981, an involuntary petition for relief under Chapter 7 was filed against Denzil Robbins and subsequently an order was entered granting such relief on November 2, 1983. The trustee filed notice of the Denzil Robbins Bankruptcy with the Recorder of Deeds in Christian County, Missouri on December 27, 1983, and he later filed such notice with the Recorder of Deeds in Oklahoma County, Oklahoma on April 16, 1984.

On January 7, 1985, Gene Robbins deeded the Ranch to Ashley Hotel Company and on the same day, the Bank issued a loan in the name of Ashley Hotel Company in the amount of $153,446.86, secured by the Ranch. By December 31, 1985, the loan to Ashley Hotel Company was paid down to $98,446.86, however, on January 6, 1986, the loan was increased and renewed for $152,561.81. On March 13, 1986, the Ashley Hotel Company deeded the Ranch to Finley River Ranch Company and on the same day, a new loan was issued by Bank for $247,367.17 in the name of Finley River Ranch Company. Finally, on August 28, 1986, the Adversary Complaint to Compel Turnover was filed in this proceeding against Bank.

On March 25, 1988, the Office of the Comptroller of the Currency determined that the Bank was insolvent and ordered the Bank closed. The Office of the Comptroller of the Currency took possession of the Bank's assets and affairs and tendered to the FDIC the appointment as receiver of the Bank. Pursuant to 12 U.S.C. Section 1821(c), the FDIC accepted appointment as receiver and took possession of the Bank's assets and affairs, including the Bank's claim against the debtor in this bankruptcy proceeding. LAW AND ANALYSIS:

1. Is the Ranch part of the Bankruptcy Estate?

To be property of the estate, Debtor must have had a legal or equitable interest in the Ranch at the time of the filing of the petition, or the Trustee must use one of his avoidance powers and bring the property into the estate pursuant to Section 550. (11 U.S.C. § 541(a)(3)). At the time the petition was filed, Gene Robbins had legal title to the Ranch.

*Section 550*

Section 541 defines "property of the estate" as all interests of the Debtor as of the commencement of the case, and includes certain property acquired thereafter, including property acquired by virtue of avoided transfers. Property of the estate includes any interest in property that the trustee recovers under 11 U.S.C. Section 550. "If a transfer is avoided under Sections 544, 545, 547, 548, 549, or 724(a), the property transferred may be recovered by the trustee, under certain circumstances, for the estate pursuant to section 550(a); and the property recovered under section 550(a) becomes property of the estate pursuant to section 541(a)(3)." *In re Jameson's Foods, Inc.*, 35 B.R. 433, 435 (Bkrtcy. D.S.C.1983).

The only relevant avoidance sections under Section 550 which can be used by the trustee in this case to recover the Ranch would be Section 548 or Section 544(b). Section 559 is not relevant in initially determining whether the Ranch is property of the estate because that section deals with bringing post-petition transfers of property which have already been determined to be property of the estate back into the estate.

A. Section 548

Section 548 grants the trustee the power to avoid fraudulent transfers. Under Section 548, a trustee may avoid a transfer of the debtor's interest in property within one year before the petition is filed if the debtor voluntarily or involuntarily made such transfer with actual intent to hinder, delay or defraud any entity to which the debtor was or became indebted to on or after the date such transfer was made. 11 U.S.C. § 548(a)(1). The trustee believes that, prior to bankruptcy, the debtor conveyed the Ranch to a third party (his son, Gene Robbins) who subsequently conveyed the Ranch to Ashley Hotel Company, an Okla-

882

homa ·Corporation, in an effort to conceal assets or defraud creditors.

On July 29, 1980, Gard Corp. deeded the Ranch to Denzil Robbins, and on that same day, Denzil and his then wife, Audrey, deeded the Ranch to Deegene Land Company. Deegene Land Company then deeded the Ranch to Gene Robbins on July 15, 1981. The involuntary bankruptcy was filed on November 16, 1981. Therefore, the transfer made by Denzil and Audrey Robbins would be outside the one year period, but the transfer by Deegene Company to Gene Robbins would be within the one year Section 548 avoidance period.

This court must then decide whether the transfer made by Deegene Corporation to Gene Robbins was actually a transfer made by the debtor, Denzil Robbins, and if so, whether Denzil Robbins made such transfer with the intent to hinder, delay or defraud any entity to which the debtor was or became indebted to on or after the date such transfer was made.

This court has previously determined that Deegene Corp. was an alter ego of Denzil Robbins and that the transfer of properties by Denzil Robbins into said corporation was with the express purpose of attempting to place any assets put into it beyond the lawful reach of his creditors. (See Order of June 22, 1988). (It is the general practice of courts to take judicial notice of all of the previous Orders entered in a case. *Messenger v. Anderson*, 225 U.S. 436, 32 S.Ct. 739, 56 L.Ed. 1152 (1912)). Further, the order states that said corporations are nothing more than the alter ego of Denzil Robbins and therefore, said corporate entities should be disregarded as fictitious and have no legal effect. As such the transfer by Deegene Corp. was a transfer by Denzil and thus Section 548 applies and the requisite intent to hinder, delay or defraud has been found.

*Statute of Limitations—Section 548*

Assuming an action under 548 can be sustained, the court must also determine if such an action was brought within the limitations period. According to Section 546(a), an action under Section 548 must be commenced before the earlier of: (1) two

years after appointment of the trustee or (2) the time the case is closed or dismissed. This case has not been closed or dismissed, therefore, the limitation period is two years after the appointment of the trustee, and not within two years of the date the mortgages were made as asserted by the trustee in his brief. The trustee was appointed on November 2, 1983. The date of the turnover complaint was filed August 28, 1986, which is more than two years after the appointment of the trustee, therefore, the trustee would be time barred from asserting an action under Section 548.

B: 544

Under Section 544(b):

The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim....

The trustee's first amended complaint alleges that debtor has transferred property in fraud of creditors and in violation on Section 428.010 RSMo. and in violation of Title 24, §§ 101–101 of the Oklahoma Statutes, 1981, and in violation of the Bankruptcy Code, both prior to and subsequent to the filing of the involuntary petition.

This court's Findings of Fact and Conclusions of Law of June 22, 1988 held that Deegene Corporation, Ashley Hotel Company and Finley River Ranch Company are all alter egos of Denzil Robbins (*Consolidated Sun Ray, Inc. v. Oppenstein*, 335 F.2d 801, 806 (8th Cir.1964); *Fidelity and Casualty Company v. Glass*, 327 S.W.2d 538, 541 (Mo.App.1959)), and that: "... any conveyances of properties into said corporations by Denzil Robbins were with the intent to defraud creditors in violation of § 428.020, V.A.M.S., and are null, void and of no effect." See *Bank of New Cambria v. Briggs*, 361 Mo. 723, 236 S.W.2d 289, 291 (1951); *Conrad v. Diehl*, 344 Mo. 811, 129 S.W.2d 870, 877 (1939); *Community Federal Savings & Loan Association v. Boyer*, 710 S.W.2d 332, 334 (Mo.App.1986); *Barnard v. Barnard*, 568 S.W.2d 567, 570 (Mo.App.1978). Section 428.020 is the Mis-

souri statute covering conveyances to defraud creditors.

*Statute of Limitations—Section 544*

■ "Applicable law" under Section 544(b) has been widely held to include state law. 4 Collier on Bankruptcy § 544.03[1] (15th ed. 1987); *In re TMIC Industrial Cleaning Co.*, 19 B.R. 397, 399 (Bkrtcy.W. D.Mo.1982); *In re Hescon Developers, Inc.*, 81 B.R. 26, 30 (Bkrtcy.S.D.Cal.1987). Although Section 546(a)(1) states that "An action or proceeding under Section 544, 545, 547, 548, or 553 of this title may *not* be commenced after the earlier of (1) two years after the appointment of a trustee [ ]; or (2) the time the case is closed or dismissed", the Code also provides that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim". (11 U.S.C. 544(b)). "Since the bankruptcy court is applying the forum state's substantive law of fraudulent conveyance in actions brought under Section 544(b), the bankruptcy court is required to apply the forum state's statute of limitations governing fraudulent conveyances." *In re Josefik*, 72 B.R. 393, 397, n. 4 (Bkrtcy.N.D.Ill.1987); See also *Suslick v. Rothschild Securities Corp.*, 741 F.2d 1000, 1004 (7th Cir.1984) (securities law) (superceded by statute).

■ While the trustee cites Missouri's statute of limitations for an action for the recovery of lands, Mo.Ann.Stat. Section 516.010 (Vernon's 1987), the applicable Missouri statute of limitations would be Mo. Ann.Stat. Section 516.120 (Vernon's 1987), which provides that an action for relief on the ground of fraud is five years accruing from the discovery of such fraud by the aggrieved party, but in any event such action must be commenced within ten years, of the facts constituting fraud.

■ The fraud in this case occurred upon the transfer of the Ranch from Deegene Company to Gene Robbins on July 15, 1981. This turnover complaint was filed on August 28, 1986, over five years and a month after the actual fraudulent transfer. However, the statute of limitations starts running "accruing from the *discovery* of such fraud" (emphasis added). In this case, the trustee did not find out about the fraud until later—sometime within the five year period.

The practical aspects of the case explain the delay in bringing this turnover action and why the trustee did not immediately know of Denzil Robbin's fraud with regard to these transactions. The debtor refused to answer interrogatories, respond to request for production of documents, or appear to answer questions under oath until after the turnover complaint was filed. In the first bankruptcy schedule he invoked the Fifth Amendment. The trustee could have done nothing more than it did to discover the existence of the Ranch property and its ties to the debtor and his alter-ego corporations. It was not until after Bank was named a party that any disclosure concerning Denzil Robbins financial affairs was made. The trustee filed his First Amended Complaint within five years of discovering debtor's pre-petition transfer to Gene Robbins.

*Statute of Limitations—Section 550*

A Section 550 recovery of property action must be asserted before the earlier of: (1) One year after avoidance of the transfer, or (2) the time the case is closed or dismissed. The case has not been closed or dismissed, therefore, the trustee has one year after the avoidance of the transfer to recover the property under Section 550 and bring it into the estate. The avoidance of the transfer is effective upon the issuance of this opinion, therefore, the trustee's Section 550 action to bring the property into the estate is within the one year period.

2. 550(b) defense of any of the transfers?

A turnover action under Section 550 may be avoided, however, pursuant to Section 550(b) which provides that a good faith transferee for value without knowledge of any alleged voidability, or any immediate or mediate good faith transferee of such transferee, is not liable for return of the property.

"The Code does not define 'good faith' but courts have long defined this term under prior law." 4 Collier on Bankruptcy P. 550.02, p. 550–9. (15th ed. 1987). "The question is solely whether the grantee knew or should have known that he was not trading normally but that, on the contrary, the purpose of the trade, so far as the debtor was concerned, was the defrauding of his creditors." 4 Colliers P. 550.02, p. 550–9, n. 3 (citations omitted). Although neither the Code, nor the legislative history interprets the standard to be used in determining whether a subsequent transferee took "without knowledge of the voidability of the transfer avoided", "[t]he Commission intended the standard to mean 'if the transferee knew facts that would lead a reasonable person to believe that the property [transferred] was recoverable.' ": 4 Collier on Bankruptcy P. 550.03 p. 550–10 (15th ed. 1987).

Subsection (b)(2) suggests that once a transferee of the debtor's initial transferee falls under 550(b)(1), any subsequent transferee need only show good faith. p. 550–11.

"The phrase 'good faith' in this paragraph is intended to prevent a transferee from whom the trustee could recover from transferring the recoverable property to an innocent transferee, and receiving a retransfer from him, that is "washing" the transaction through an innocent third party. In order for the transferee to be excepted from liability under this paragraph, he himself must be a good faith transferee." 4 Collier on Bankruptcy P. 550.3, p. 550–11, n. 8 (15th ed. 1987).

a. Prepetition transfer—July 29, 1980

■ This transfer was made from Denzil and Audrey Robbins to Deegene Land Company and then in turn from Deegene Land Company to Gene Robbins. Since Deegene Land Company is the alter ego of Denzil Robbins, this transfer will be considered one made by Denzil Robbins to Gene Robbins. This Court finds that Gene Robbins is not a good faith purchaser because Section 550(b) is not meant to avoid washing or retransferring transactions through a third party which is what occurred here. After holding the Ranch from July 15, 1981 until January 7, 1985, Gene retransferred the property to a corporation wholly owned by Denzil Robbins and his second wife, Roberta. John Martin's testimony (an officer of the Bank) makes it clear that the purpose of this transfer was to shield the property from Denzil Robbins' first wife, and that in actuality, Denzil Robbins himself owned the property. Considering the close family relationship, the purpose of the transfer and the later retransfer, this Court finds Gene Robbins was not a good faith transferee.

b. Postpetition transfers—January 7, 1985 and March 13, 1986

■ The January 7, 1985, transfer was made from Gene Robbins to the Ashley Hotel Company and the Bank loaned $153,-446.86 to Ashley Hotel Company secured by the Ranch. This loan was then paid down to $98,446.86 by December 31, 1985, but on January 6, 1986, additional money was loaned secured by this property raising the balance to $152,561.81. The March 13, 1986, transfer was made from the Ashley Hotel Corporation to Finley River Ranch Company and the Bank issued a new loan secured by the property for $247,367.17.

If the initial transferee was a good faith purchaser under 550(b)(1), then later good faith purchasers are also protected under 550(b)(2), but later purchasers not in good faith are not protected from recovery by the trustee. However, if the initial transferee, Gene Robbins, was not a good faith purchaser, neither he nor any later purchasers (including good faith purchasers) would be protected under Section 550(b). Therefore, since Gene Robbins was not a good faith purchaser, the FDIC may not avoid recovery of the property by the trustee under Section 550(b), even with a showing that it was a good faith purchaser.

3. Can the trustee avoid the transfers of January 7, 1985 and/or March 13, 1986, pursuant to Section 549?

Section 549 provides that the trustee may avoid a transfer of property of the estate:

"(1) that occurs after the commencement of the case; and (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or (B) that is not authorized under this title or by the court." " 'Transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, *including retention of title as a security interest* and foreclosure of the debtor's equity of redemption...." (11 U.S.C. § 101(50) (emphasis added)).

It is well settled that post-petition transfers of estate property may be made only as authorized by the court. 11 U.S.C. 549; *Matter of Isis Foods, Inc.*, 37 B.R. 334 (W.D.Mo.1984), and such post-petition transfers are subject to avoidance under Section 549, unless excepted from operation of that rule. *In re Watson*, 65 B.R. 9 (Bkrtcy.C.D.Ill.1986), defines the elements of a Section 549 action as follows:

Under this sub-section [11 U.S.C. Section 549(a) ] a four part inquiry is required: (1) whether a transfer of property occurred; (2) whether the property was property of the estate; (3) whether the transfer occurred after the commencement of the case; and (4) whether the transfer was authorized by the court of the Bankruptcy Code.

*Id.* at 11. Unless all four of the above elements are present, Section 549 is inapplicable. See also *In re Smith*, 24 B.R. 19 (Bkrtcy.W.D.N.C.1982), in which the court recognized that where the "transfer" of a debtor's interest in real estate occurs *prior* to the date of filing of debtor's bankruptcy petition, 11 U.S.C. Section 549 is not applicable.

In this case, (1) a transfer occurred within the definition set out in 101(50) because the Bank took a security interest in the Ranch; (2) as discussed above, the Ranch was property of the estate; (3) the two transfers occurred after the commencement of the case, January 7, 1985 and March 13, 1986; and, (4) the transfers were not authorized by the bankruptcy court. In fact, by order of February 3, 1988, this Court prohibited such transfers.

*Limitations period—549*

Actions under this section must be brought within two years after the date of the transfer sought to be avoided; or, if earlier, before the time the case is closed or dismissed. (11 U.S.C. § 549(d)).

The date of the postpetition transfers sought to be avoided by the trustee are January 7, 1985, and March 13, 1986. This turnover action commenced on August 28, 1986 which is within two years of both of these postpetition transfers, therefore, an action under Section 549 would not be time barred.

4. Is the FDIC protected from avoidance of the January 7, 1985 and/or March 13, 1986 transfers pursuant to Section 549(c)?

█ Section 549(c) provides that the trustee:

"may not avoid under section (a) of this section a transfer of real property to a good faith purchaser without knowledge of the commencement of the case and for present fair equivalent value unless a copy or notice of the petition was filed where a transfer of such real property may be recorded to perfect such transfer, before such transfer is so perfected that a bona fide purchaser of such property, against whom applicable law permits such transfer to be perfected, could not acquire an interest that is superior to the interest of such good faith purchaser. A good faith purchaser without knowledge of the commencement of the case and for less than present fair equivalent value has a lien on the property transferred to the extent of any present value given, unless a copy or notice of the petition was so filed before such transfer was so perfected."

*Burden of Proof*

Bankruptcy Rule 6001 provides that any entity asserting the validity of a transfer under Section 549 of the Code shall bear the burden of proof. "In the event that the trustee commences an action to avoid a proscribed, postpetition transfer of property of the estate, the transferee or any

entity who asserts the validity of the transfer under Code § 549 has the burden of proof as to that issue ... Any party who wishes to sustain one of these exceptions in response to a trustee's complaint to avoid a postpetition transfer has the burden of proof under Rule 6001 to establish that the questioned transaction meets one of the permitted exceptions." Norton's Bankruptcy Law & Practice, Bankruptcy Rule 6001, Editor's Comment (1983). Therefore, the FDIC, as successor in interest to Bank, bears the burden of proof to establish that Bank was a good faith purchaser without knowledge. *In re Ward,* 74 B.R. 465 (D.N. J.1987), *aff'd,* 837 F.2d 124 (3rd Cir.1988).

The trustee does not contest that the FDIC was a transferee and took for value, therefore, the only issues to be decided is the Bank's good faith, knowledge that Denzil Robbins and not the Finley River Ranch Company or The Ashley Hotel Company owned the Ranch, and/or whether the Bank had notice of Denzil Robbins' bankruptcy.

*Good Faith*

"The question of good faith [ ] 'depends under the circumstances on whether the transaction carries the earmarks of an arms-length bargain.' " *Inland Security Co. v. Estate of Kirshner,* 382 F.Supp. 338 (W.D.Mo.1974). Collier, in his bankruptcy treatise, states that a transferee's good faith depends upon whether the transferee "knew or should have known that [the debtor] was not trading normally but that on the contrary, the purpose of the trade so far as the debtor was concerned was the defrauding of his creditors." 4 Collier on Bankruptcy, p. 550–9 (15th ed. 1987).

Knowledge

" 'Knowledge' may be classified in a legal sense as positive or imputed. Ordinarily, however, the word is held to mean actual knowledge, which is not necessarily absolute certainty.

The term is also frequently employed to signify constructive knowledge, which neither indicates nor requires actual knowledge, but means knowledge of such circumstances as would ordinarily lead on investigation, in the exercise of reasonable diligence which a prudent man ought to exercise, to a knowledge of the actual facts. In this connection the rule has been said to have been frequently announced that means of knowledge may be equivalent to knowledge. There is also a corollary that one who intentionally remains ignorant may be chargeable in law with knowledge. In some connections the word 'knowledge' means either actual or constructive knowledge."

51 C.J.S. Knowledge, pp. 538–39.

For reasonable cause to exist, it is not necessary that a person benefited by a transfer know positively that the result of the transaction will be to effect a preference: it is sufficient for a finding of reasonable cause that the person or his agent has knowledge of such facts as would induce a person of reasonable prudence to make inquiry when such inquiry would have developed the facts essential to a knowledge of the situation. On the other hand, if the known facts should raise only a suspicion that the Debtor might be insolvent, the test is not met. *Bernstein v. South Central Bell Telephone Co.,* 730 F.2d 987, 990 (5th Cir.1984), *citing, Mayo v. Pioneer Bank & Trust,* 297 F.2d 392, 395 (5th Cir.1961). A person ought to be treated as if he had notice if "the circumstances are such as enable the court to say, not only that he might have acquired, but also that he ought to have acquired it, but for his gross negligence in the conduct of the business in question." *United States v. Detroit Timber and Lumber Co.,* 200 U.S. 321, 333, 26 S.Ct. 282, 285, 50 L.Ed. 499 (1905).

*Evidence*

The bank's officer who dealt with the debtor, John Martin, testified that Robbins' financial statements from Bank's own files clearly showed that Denzil Robbins himself, not these fictitious corporations, was the owner of the property and that the Bank believed it was dealing directly with Denzil Robbins. (See Trial Exhibits 113, 215, and 217 which are financial statements dated September 12, 1984; June 15, 1985; and December 31, 1986). Martin, an employee of the Bank acting within the scope

of his employment therefore the agent of the Bank, testified that the bank relied on the content of these financial statements in making the loans and that he himself believed that Denzil owned the property. He also testified that (1) the property was Denzil Robbins', even though it was in the name of his son, Gene; (2) he understood the money was being loaned to Denzil and in fact, Trial Exhibit 226 shows that some of the money was used to pay off Denzil's personal loan; and (3) that the property to be used as collateral was not in Denzil Robbins' name because he was going through a divorce and wanted to hide it from his wife. At the hearing on May 24, 1988, Martin also testified that he was aware of the possibility that Denzil Robbins would file a Chapter 11 petition in bankruptcy. And, the Bank did a Missouri UCC filing in both Denzil Robbins name and the Ranch because Denzil Robbins was a guarantor on the note.

Further evidence which supports this Court's conclusion that the Bank was not a good faith party under Section 549(c) includes:

1. The Bank's credit applications of October 26, 1984 and July 30, 1986 omitted to answer the question whether Denzil Robbins had been declared bankrupt which was the usual custom of the Bank. From this, the Trustee infers knowledge by the Bank of Denzil Robbins' bankruptcy, but failure to document for fear of being written up by bank examiners for such a loan, thereby losing profitable business.

2. Also, the Bank made no comment of Denzil Robbin's bankruptcies in September 30, 1986 credit memo after the Bank knew of both of Denzil Robbins' bankruptcies.

3. Martin failed to investigate Denzil's situation when he learned one of Denzil's motels was in bankruptcy indicating the bank did not want to learn of Denzil's bankruptcies (intentional ignorance).

4. The Bank failed to investigate Audrey Robbins after she refused to provide credit information, and the words "seven years" was stamped on her file. According to the testimony of the Bank's own president, the only significance of these words was to indicate bankruptcy.

5. Additionally, at the time the second loan made, by testimony of Martin, the bank had actual knowledge of one of at least one of Robbin's bankruptcies at that time. Also, A bank memorandum dated March 4, 1986, indicates that a receiver had been appointed to manage Robbins' motel.

*Unclean Hands*

Furthermore, the Bank is not a good faith purchaser because it comes into this case with unclean hands.

1. The bank knew of Denzil's intent to keep the Ranch out of his wife's reach and it assisted him in his deceit. John Martin, the former employee of Bank who dealt with Denzil Robbins since 1984, testified Denzil told him he had placed the property in his son's name and would place it in a corporate name to keep it out of reach of his creditors, in particular his wife.

2. The bank also failed to inform its title company of the actual name of the owner of the property.

3. On February 25, 1986, Martin indicated to Twin Cities Savings Bank and on December 27, 1985 he indicated to Security Pacific, that Denzil might be a good credit risk when it knew this to be untrue.

4. Bank loaned Denzil additional money to cover his overdrafts even after it believed he was a bad credit risk. Martin testified Denzil had an average five figure overdraft.

5. The May, 1987, loan from Bank secured by Texas and Mississippi property made after Bank made party to Missouri bankruptcy proceeding (this adversary) and court issued restraining order prohibiting Denzil and bank from encumbering and transferring assets.

6. The proceeds of the March 13, 1986 loan was used to pay off overdrafts on Robbins' Southgate Motel operation which was in bankruptcy at the time. Denzil did not receive any of that money.

The $89,000.00 in overdrafts by Denzil at Bank should have been subject to the Southgate Motel bankruptcy and dis-

charged, but instead, the bank transferred the loan from Ashley Hotel Company to Finley River Ranch Company, increased the loan by $150,000.00 and credited to overdrafts. It increased the encumbrance on the Ranch from $152,000.00 to $247,000.00.

Notice

The trustee filed a notice of bankruptcy for Denzil Robbins in Christian County, Missouri on December 27, 1983, which was over one year prior to the bank's first loan secured by the Ranch.

*Conclusion*

The Bank has not met its burden of proof to show it was a good faith transferee under Section 549(c).

—Knowledge

The evidence is clear that Bank knew that the property belonged to Denzil Robbins. Here there is indication that the bank's loan was not an arms-length transaction. The bank's loan file did not contain all of the routine bank documentation as testified to by the bank's own officers. The facts and circumstances are sufficient to put a reasonably prudent person on inquiry of Denzil Robbins' ownership of the Ranch and bankruptcy. In this case the bank, at the very least, should have had constructive knowledge of Denzil Robbins' bankruptcy especially in light of their knowledge of the bankruptcies of many of the entities associated with him and his history of delinquent payment or nonpayment and overdrafts.

This Court believes the Bank, in fact, did know that Denzil Robbins was the true owner of the Ranch and that Denzil Robbins was in bankruptcy even at the time the first loan was made to The Ashley Hotel Company. There is no doubt that the Bank had knowledge of the commencement of the bankruptcy case at the time of the second transfer and of the Ranch's connection with Denzil Robbins, therefore, the bank certainly cannot claim a defense under Section 549(c) for the recovery of the Ranch.

—Notice

Although there was no notice of bankruptcy of the Finley River Ranch Company filed in Christian County real estate records, on April 16, 1984, nine months before the first loan pertaining to the Ranch was made by the Bank the trustee in Bankruptcy filed a notification of the bankruptcy of Denzil Robbins with the Recorder of Deeds of Christian County, Missouri. (See Trial Exhibit 191 and Attachment 2). If ever there was a case where a party had sufficient knowledge to have a duty to inquire further, it is this case. The Bank should have been on notice to check the real estate records for Denzil Robbins bankruptcy as opposed to Finley River Ranch Company because of the bank's knowledge that the property actually belonged to Denzil Robbins.

The Bank had an absolute obligation, based on its knowledge of the true owner of the Ranch to check with the Recorder of Deeds to see what, if any, liens, notices of bankruptcy, or other potential encumbrances were on file in Christian County in the name of Denzil Robbins that might affect title to that property. If the Bank had properly checked the Recorder of Deeds office for notice of Denzil Robbins' bankruptcy before it made a loan secured by the Ranch, it would have found the trustee's filing of such and would not be a good faith transferee without notice under Section 549(c).

5. Does the FDIC have a defense under 12 U.S.C. § 1823(e)?

The law affords the FDIC different remedies and protections according to the capacity it chooses to take over a bank. In the event of a failure, the FDIC must determine which of two statutorily available alternatives it should use to take over the bank. One alternative is outright liquidation of the bank (12 U.S.C. § 1821). The other option is implementation of a "purchase and assumption" transaction (12 U.S.C. § 1823(c)(2)(A), whereby the FDIC arranges for another bank to purchase and immediately to reopen the failed institution, with the FDIC fund paying the assuming

bank for the difference between liabilities and assumed assets and then attempting to minimize the loss to the fund by collecting on the assets taken by the FDIC rather than the assuming bank. See, *Gunter v. Hutcheson,* 674 F.2d 862, 865–66 (11th Cir. 1982), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). Assets not of the highest quality are returned to the receiver and then the FDIC as insuror purchases the returned assets from the FDIC as receiver.

The FDIC, when acting as receiver for a failed bank, is not identical with the FDIC in its corporate capacity, acting as insuror of a failed bank. "Once the FDIC, acting in its corporate capacity, purchases the assets of the closed bank, it is simply not a successor-in-interest to the closed bank ...". *Federal Deposit Insurance Corp. v. Vogel,* 437 F.Supp. 660, 663 (E.D.Wis.1977). When the FDIC is functioning as receiver of a state bank it is not entitled to the protections of the FDIC in its corporate capacity, acting as insuror of a failed bank. If the FDIC took over the Bank as receiver, the FDIC merely steps into the bank's shoes and can only assert the same defenses available to the bank. *In re Hescon Developers, Inc.,* 81 B.R. 26, 29 (Bkrtcy.S. D.Cal.1987). However, if the FDIC purchased and assumed the assets of the bank, it may be able to assert it is a good faith purchaser in its own right and therefore assert a defense to the post-petition avoidance actions under either § 549(c), 12 U.S. C. § 1823(e), or federal common law.

The FDIC, in its corporate capacity, loaned to FDIC, receiver of Bank, a substantial sum used by receiver to pay a loan made to the Bank by the Federal Reserve Bank of Kansas City. Said loan to the receiver was secured by all assets of Bank, including the notes and deeds of trust at issue herein. However, the FDIC chose to merely liquidate the Bank when it closed on March 25, 1988, and did not acquire the note to aid a purchase and assumption arrangement. Therefore, it stands in the shoes of the Bank and cannot assert certain privileges available only to the FDIC as purchaser. Section 1823(e) applies only to the FDIC in its corporate capacity, not in

its capacity as a receiver. *Matter of Selden,* 58 B.R. 667, 677 (Bkrtcy.D.Neb.1986). *But see In re La Mancha Aire, Inc. v. FDIC,* 41 B.R. 647 (Bkrtcy.S.D.Fla.1984) § 1823(e) "is designed to protect the FDIC both as insuror and as receiver"). Therefore, the FDIC does not have a defense under 12 U.S.C. § 1823(e).

CONCLUSION

The Ranch was initially property of the estate pursuant to Section 544(b) and applicable Missouri law, and the postpetition transfers of the Ranch can be brought back into the estate by the trustee pursuant to Section 549. The FDIC does not have a defense to either the Section 544 lien avoidance pursuant to Section 550(b), nor does it have the defenses of Sections 550(b), 549(c), or 12 U.S.C. § 1823(e), to the postpetition recovery of the property.

This Opinion shall constitute Findings of Fact and Conclusions of Law as required by Rule 7052, Rules of Bankruptcy.